**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| COGNIPOWER LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2:23-CV-00160-JRG |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD., and | § | |
| SAMSUNG ELECTRONICS AMERICA, INC., | § | |
| | § | |
| Defendants. | § | |

# CLAIM CONSTRUCTION ORDER

In this patent case, CogniPower LLC asserts claims from five reissued patents concerning switched-mode power converters: U.S. Patents RE47,031, RE47,713, RE47,714, RE49,157, and RE49,425. These patents, which are related and have the same specification,[1] more specifically relate to using a feedback mechanism called a "demand pulse" to signal when the converter should enter an energy-bearing cycle to provide more power to an external load.

The parties dispute the scope of ten groups of terms. In addition, Samsung argues all asserted claims are indefinite based on an "explicit disclaimer" in the last paragraph of the specifications' written descriptions. Having considered the parties' briefing and arguments during an August 12, 2024 hearing, the Court resolves the disputes as follows.

[1] '425 Patent at [63] (noting the underlying application is a "[c]ontinuation of application No. 15/202,746, . . . now Pat. No. Re. 47,714, which is a continuation of application No. 15/090,929, . . . now Pat. No. Re. 47,031"); *see also* '713 Patent at [63] (noting the underlying application is a "[c]ontinuation of application No. 15/090,929, . . . now Pat. No. Re. 47,031").

# I. BACKGROUND

## A. The Patents

Switched-mode power converters are "ubiquitous as plug-in adaptors used to power a plethora of electronic devices." '031 Patent at 1:37–38. Switched-mode converters continually switch between "on" and "off" states to minimize wasted energy relative to linear supplies, which remain in a continuous "on" state. Generally, switched-mode converters regulate their output voltage by changing the duty cycle, which is the ratio of "on" time to "off" time, and that regulation is independent of the needs of the load to which the supply is connected.

The patents teach a feedback mechanism to switch on the supply only when additional energy is needed. When the voltage at the output terminals decays below a threshold, which happens as the converter drives current into the attached load, the disclosed circuits detect that decay and send a signal that "indicates the need for another energy-bearing cycle." '031 Patent at 3:63–64.




**Fig. 1**

Figure 1 (above) of the patents shows the simplest disclosed embodiment so far as structure is concerned. The power converter (10a) has input terminals (11a, 12a) connected to a DC voltage source (5a) and output terminals (13a, 14a) connected to an external load (7a). The converter has a first circuit, shown to the left of a transformer (100a), that includes the transformer's primary winding (101a) and a regeneration winding (102a). This is generally referred to as the "primary side" of the converter. The converter also has a second circuit, shown to the right of the transformer, that includes the secondary winding (104a). The "secondary side" of the converter is electrically isolated from the "primary side" by the transformer.

To provide the necessary feedback from the secondary side to the primary side, a comparator (401) compares the voltage at the load to a reference voltage (400a). When the voltage at the load reaches the reference voltage, the comparator triggers a "demand pulse generator" (503a), which closes a switch (502a) to allow energy stored in capacitor (501a) to flow to the secondary winding, causing what the patent calls a "demand pulse" across the transformer to close a primary switch (200a) and start another "energy bearing cycle."[2] Effectively, the "demand pulse" signals demand by the output terminals for more energy.

Many of the parties' disputes concern the meaning of "demand pulse," "demand pulse generator," and "generating demand pulses." Claim 1 of the '031 Patent is a good example of how those terms are used:

> 1. Apparatus configured to provide switched-mode power conversion, the apparatus comprising:
>
> an input port configured to receive input power;

[2] In these types of converters, when the switch is closed, the primary-side circuit transfers energy from the input voltage source to the transformer. When the switch is then opened, the secondary-side circuit transfers the energy from the transformer to the output load.

a switch configured to commutate the input power;

galvanic isolation circuitry configured to provide galvanic isolation between the input port and an output port, wherein the galvanic isolation circuitry comprises a transformer comprising (i) a primary winding arranged in circuit with the input port and the switch and (ii) a secondary winding arranged in circuit with a first rectifier and the output port, wherein the transformer is configured to transfer power from the input port to supply voltage or current to a load connected to the output port;

a **demand pulse generator** galvanically connected to the secondary winding and configured to generate **demand pulses** applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load; and

a capacitor and a second rectifier both galvanically connected to the secondary winding, wherein:

the second rectifier is different from the first rectifier and is poled to charge the capacitor during forward pulses of the apparatus; and

the **demand pulse generator** is powered by energy stored in the capacitor to generate the **demand pulses**.

’031 Patent at 12:7–34 (disputed terms bolded). Similarly, Claim 18 recites:

18. In an isolated switched-mode power converter having an input port and an output port, a method of regulation comprising:

(a) comparing a feedback signal based on a voltage or current at the output port with a reference signal that is galvanically associated therewith;

(b) **generating demand pulses** responsive to that comparison;

(c) applying the **demand pulses** to an output-port side of galvanic isolation circuitry;

(d) receiving the **demand pulses** at an input-port side of the galvanic isolation circuitry; and

> (e) controlling the converter responsive to the **demand pulses** to supply the voltage or current at the output port, wherein step (b) comprises:
>
> (b1) using a rectifier to charge a capacitor during forward pulses of the power converter, wherein the rectifier and the capacitor are connected in circuit with the output-port side of the galvanic isolation circuitry; and
>
> (b2) generating the **demand pulses** using energy stored in the capacitor.

*Id.* at 14:13–36.

### B. Prior Constructions of Certain Terms

In March 2021, the United States District Court for the District of Delaware issued constructions for four of the terms at issue:

| Claim Term | Court's Construction |
|---|---|
| "demand pulse"<br>'031 Patent, Claims 1, 10, 18, 64; '713 Patent, Claims 18, 48 | "pulse generated on the secondary side that determines when to turn on a primary switch and does not determine when to turn off the switch" |
| "arranged in circuit"<br>'031 Patent, Claims 1, 10, 64 | Plain and ordinary meaning. |
| "connected in circuit"<br>'031 Patent, Claims 18, 24, 35, 36, 48, 51, 63 | Plain and ordinary meaning. |
| "a leading edge of a single demand pulse will turn on the switch independent of other demand pulses"<br>'031 Patent, Claims 32, 34, 45, 47, 60, 62 | Plain and ordinary meaning. |

Cl. Constr. Order (D. Del.), Dkt. No. 136-8 at 2–3.

## II. GENERAL LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is

presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party proffers a proposed level of ordinary skill in the art in their briefing. CogniPower's expert, however, characterizes a skilled artisan at the time of invention as having "at least a B.S. degree, or its equivalent, in electrical engineering or a related field, and approximately two years of practical experience working with power converters, switching regulators, or circuit design (digital, analog, or mixed), or an equivalent combination of academic study and work experience." Magnione-Smith Decl., Dkt. No. 139-1 ¶ 23. Because this definition is too broad in that it includes *any* level of secondary education in electrical engineering or related fields, the Court opts for the level of skill adopted by the PTAB when considering challenged claims from the '031 Patent. Specifically, a skilled artisan at the time of invention would have had a "B.S. degree, or its equivalent, in electrical engineering or physics and approximately two years of practical experience working with switching regulators and analog/mixed signal circuit design, or an equivalent combination of academic study and work experience." Final Written Decision, Dkt. No. 136-15 at 7–8.

## IV. THE DISPUTED TERMS

### A. Specification Disclaimer

Samsung's first argument centers on the last paragraph of the written description of each patent. After more than a column of what might be called "patent-prosecutor boilerplate," the

written descriptions explain:

> The embodiments covered by the claims in this application are limited to embodiments that (1) are enabled by this specification and (2) correspond to statutory subject matter. Non-enabled embodiments and embodiments that correspond to non-statutory subject matter are *explicitly disclaimed* even if they fall within the scope of the claims.

'031 Patent at 11:66–12:4 (emphasis added); *see also* '713 Patent at 12:4–9; '714 Patent at 12:11–16; '157 Patent at 12:11–16; '425 Patent at 12:13–18. Samsung argues that because disclaimer is a claim-construction issue, and because according to these paragraphs the Court must first determine what embodiments are enabled to determine what has been disclaimed, the Court must resolve the enablement question before construing the claims. That, however, violates the Federal Circuit's requirement that claim construction come first, which renders the claims indefinite. *See generally* Dkt. No. 141 at 4–7.

At a minimum, disclaimer must be clear and unmistakable. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("To constitute disclaimer, there must be a clear and unmistakable disclaimer."); *see also Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (noting disavowal must be unequivocal and unambiguous). Here, the language in question at most operates as a "contingent" disclaimer—that is, if an embodiment is not enabled, then it is disclaimed. That's neither "clear" nor "unequivocal."

At the hearing, Samsung argued CogniPower's *intent* to disclaim subject matter is clear even if the scope of that disclaimer is not. But by making the disclaimer contingent on some other determination (e.g., enablement), it is more likely CogniPower hoped to not disclaim anything at all. That is, it only intended to disclaim subject matter if the validity of claims later became an issue, and surely CogniPower preferred that never to happen. Thus, not only is the *scope* of any disclaimer unclear, so is CogniPower's *intent*. The Court therefore holds nothing in the paragraphs

operates as a disclaimer of claim scope given its equivocal language and overall lack of clarity.

### B. "demand pulse[s]" ('031 Patent, Claims 1, 6, 10, 18, 32, 47, 48, 51, 62; '713 Patent, Claims 18, 25, 26, 30, 36, 41, 48; '714 Patent, Claims 18, 28, 40; '157 Patent, Claims 18, 20, 22, 24, 35, 40; '425 Patent, Claims 18, 28)

| CogniPower's Construction | Samsung's Construction |
|---|---|
| "pulse[s] generated on a secondary side that determines when to turn on a primary switch and does not determine when to turn off the switch" | "pulses generated on a secondary side that control and determine when the primary switch turns on but do not control or determine when the switch turns off" |

Samsung characterizes this dispute as whether these terms only "determine when to turn on a primary switch," or whether the pulses must also *control* when to turn on the primary switch. According to Samsung, CogniPower "narrowly defined" these terms during prosecution to overcome multiple cited references. Dkt. No. 141 at 21. CogniPower, however, says Samsung's construction "conflates the demand pulse and the switch." Dkt. No. 136 at 3. Moreover, says CogniPower, nothing in the specification defines "demand pulses" in terms of control, but rather as information conveyed from the secondary side to the primary side of the converter. *Id.* at 4.

The Court agrees with CogniPower. For one, the notion of "control" was first raised by the examiner during prosecution rather than by CogniPower. Specifically, the examiner summarized the invention's operation as "producing a feedback voltage through transformer winding (102a) for *controlling* the ON/OFF time of switch 200a (MOSFET) and regulating the output voltage at terminals (13a, 14a) to a desired voltage." Remarks, Dkt. No. 141-5 at CP0001728 (quoting page 6 of the related office action; emphasis added). Responding to that summary, CogniPower wrote:

> [T]hese are not accurate characterizations of the power converter of Fig. 1. First of all, the feedback signal conveyed to transformer winding (102a) is not a generic voltage. Rather, the feedback in FIG. 1 consists of demand pulses that are generated on the secondary side of the power converter and conveyed to the primary side. Furthermore, those demand pulses do not control both the ON and OFF times of

> switch 200a. Rather, the demand pulses control only the ON times of switch 200a, not the OFF times. The OFF times of switch 200a are controlled by circuitry on the primary side of the power converter of FIG. 1.

*Id.*; *see also* Remarks, Dkt. No. 141-2 at CP0001435 (acknowledging the examiner provided a "brief summary" of the invention and then responding similarly). These remarks emphasize "demand pulses" are not "generic voltages," that they are "conveyed" across the transformer, and that they only relate to the ON times of the switch. While CogniPower also states the demand pulses *control* the ON times, given this occurs in a description of operation of the device as a whole, a skilled artisan would understand that, in light of the disclosure, as shorthand for "*receipt and processing* of the demand pulses controls only the ON times." After all, that's the point of "conveying" the demand pulses to the primary side of the converter—so they can be received and acted upon by the primary-side circuitry. Regardless, CogniPower's use of "control" in its responsive remarks seems to have the same meaning as "determine" by using those terms interchangeably.

Samsung's position would be more persuasive had CogniPower, rather than the examiner, introduced the notion of "control" into the arguments, and even more persuasive had CogniPower done so in an argument focused on "demand pulse" rather than the examiner's summary of the invention's operation. As written, however, CogniPower's remarks are not clear and unmistakable enough to constitute disclaimer on the "control" issue. Accordingly, the Court adopts CogniPower's construction, which the parties agree is correct other than the "control" verbiage. Specifically, the Court construes "demand pulse[s]" as "pulse[s] generated on a secondary side that determine when to turn on a primary switch and does not determine when to turn off the switch."

### C. "demand pulse generator" ('031 Patent, Claims 1, 36, 48; '713 Patent, Claims 18, 26, 30, 48; '157 Patent, Claims 35, 40; '425 Patent, Claim 18)

| CogniPower's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning, except as to included terms or phrases otherwise construed. | Indefinite. |

The independent claims at issue recite a "demand pulse generator" that must be "configured" a certain way:

| Claim | Limitation |
|---|---|
| '031 Patent, Claim 1;<br>'425 Patent Claim 18 | "a demand pulse generator . . . configured to generate demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load" |
| '713 Patent, Claims 18, 48 | "a demand pulse generator that (i) determines when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generates corresponding demand pulses" |
| '157 Patent, Claim 35 | "a demand pulse generator that, when the output port is in regulation, (i) determines when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generates corresponding demand pulses . . . when a feedback signal based on the output port by voltage is smaller in magnitude than a reference signal" |

Samsung challenges "demand pulse generator" as indefinite. After asserting it's a coined term, Samsung says the specification does not adequately inform a skilled artisan of its meaning, and cites a wealth of evidence that seems to support that assertion. Dkt. No. 141 at 13–17. For example, the specification refers to items 503a of FIG. 1 as a "demand pulse generator," a "pulse generator," and also as a "pulse generator circuit." *See, e.g.*, '031 Patent at 3:16, 3:33, 3:62, 5:27. The patent also refers to item 503c in Figure 3 as both a "demand pulse generator" and just a "pulse generator." *See id.* at 6:12, 6:18. Both items control a switch that allows energy to be transferred

from a capacitor to the secondary winding, and then to the primary side of the converter. During prosecution, however, one of the named inventors declared that items 503a and 503c are *part of* the recited demand pulse generator, along with the switches and logic to compare the output voltage to a reference voltage. *See* Lawson Decl. (Jan. 2, 2019), Dkt. No. 141-3 ¶ 6 (1st bullet); Lawson Decl. (May 16, 2019), Dkt. No. 141-8 ¶ 7 (1st bullet); Lawson Decl. (Nov. 30, 2021), Dkt. No. 141-18 ¶ 4; Lawson Decl. (July 7, 2022), Dkt. No. 141-21 ¶ 4. But CogniPower's expert contradicts this by testifying he "would find it hard to imagine somebody saying 503a on its own is not a demand pulse generator." Mangione-Smith Depo. Tr., Dkt. No. 141-29 at 183:4–6. Yet he also testified a skilled artisan *could* say the demand pulse generator also includes the switch and comparator. *Id.* at 182:10–19; *see also id.* at 180:24–181:12.

CogniPower argues that because "pulse generator" has an ordinary meaning, "demand pulse generator" also has an ordinary meaning, but the Court is not convinced. As discussed *supra*, a "demand pulse" is a certain type of signal that indicates demand for higher voltage at the output terminals of the converter. CogniPower, however, points to definitions of "pulse generator" that characterize something one might buy from an electronics shop—e.g., a signal generator that allows the operator to produce pulses of varying amplitude, duration, shape, and frequency. Magnione-Smith Decl., Dkt. No. 136-6 ¶ 125 (citing dictionary definitions). But those definitions don't reconcile with the functions recited by the relevant claims. For example, they don't inform how a "pulse generator" would be "powered by energy stored in [a] capacitor to generate the demand pulses." '031 Patent at 12:32–34. Nor do they explain how a "pulse generator" "determines when to turn on the primary-side switch based on output voltage or output current at the output port," '157 Patent at 18:21–25, or how a "pulse generator" makes "a comparison between [a] feedback signal and [a] reference signal," *id.* at 19:22–26.

Notably, CogniPower's expert doesn't help connect the dots, opining only that "[t]he language lends itself to [a] plain and ordinary meaning. A generator generates. A pulse generator generates pulses. A demand pulse generator generates demand pulses." Magnione-Smith Decl., Dkt. No. 136-6 ¶ 204. That doesn't explain how the ordinary meaning of "pulse generator" would even apply to the disclosed embodiments' generation of "demand pulses" as set forth in the written description. In other words, given the fundamental difference between simple "pulses" from a pulse generator and the "demand pulses" of the patents, CogniPower cannot simply say a "demand pulse generator is a device that generates demand pulses."

Nonetheless, the Court agrees with CogniPower that this term is not indefinite. Despite the inconsistency between the specification, an inventor's declarations, and CogniPower's expert, the Court views this term as governed by 35 U.S.C. § 112 ¶ 6 with corresponding structure that performs the recited functions. There is, of course, a rebuttable presumption that § 112 ¶ 6 does not apply in the absence of the word "means." *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (noting "the failure to use the word 'means' . . . creates a rebuttable presumption . . . § 112, para. 6 does not apply"). But that presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language to denote sufficiently definite structure for performing the function in the context of the entire specification. *See id.* ("[M]erely because an element does not include the word 'means' does not automatically prevent that element from being construed as a means-plus-function element."). Here, Samsung has established "demand pulse generator" does not have an ordinary meaning and does not connote sufficiently definite structure for performing the recited functions to a skilled artisan.

Given "demand pulse generator" does not connote sufficiently definite structure, the

remainder of the limitations at issue, at least in the independent claims, are purely functional. The Court finds the recited functions are:

| Claim Language | Recited Function |
|---|---|
| "a demand pulse generator . . . configured to generate demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load" ('031 Patent, Claim 1; '425 Patent Claim 18) | **Function:** "generating demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load" |
| "a demand pulse generator that (i) determines when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generates corresponding demand pulses" ('713 Patent, Claims 18, 48) | **Function:** (i) determining when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generating corresponding demand pulses" |
| "a demand pulse generator that, when the output port is in regulation, (i) determines when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generates corresponding demand pulses . . . when a feedback signal based on the output port by voltage is smaller in magnitude than a reference signal" ('157 Patent, Claim 35) | **Function:** (i) determining when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generating corresponding demand pulses . . . when a feedback signal based on the output port by voltage is smaller in magnitude than a reference signal" |

Notably, although the wording of the recited functions is different, they are substantively the same. To summarize, the "demand pulse generator" decides when to send a "demand pulse" and then generates that "demand pulse."

That leaves the question of corresponding structure, which must be clearly linked or associated with the recited function. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("[S]tructure disclosed in the specification is 'corresponding' structure only if the

specification or prosecution history clearly links or associates that structure to the function recited in the claim."). Corresponding structure includes "all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). And "when multiple embodiments in the specification correspond to the claimed function, proper application of § 112, P6 generally reads the claim element to embrace each of those embodiments." *Id.*

Here, the specification discloses four embodiments in Figures 1–4, respectively. Describing Figure 1, the written description explains that, to trigger the primary-side switch, "diode 500a is briefly short-circuited by a switch 502a which is driven by a demand pulse generator 503a to source a pulse of energy from capacitor 501a into transformer 100a." '031 Patent at 3:14–17. Then,

> [w]hen the voltage at terminal 13a falls below the comparison voltage, comparison circuit 401a causes pulse generator circuit 503a to pulse, turning ON switch 502a, triggering an energy-bearing ON cycle of the blocking oscillator, and charging capacitor 301a. As load 7a drains capacitor 301a, terminal 13a voltage repeatedly falls to the voltage of reference 400a, causing comparison circuit 401a to initiate energy-bearing ON cycles.

*Id.* at 4:4–11. A skilled artisan would understand these excerpts to clearly associate the comparator 401a, switch 502a, and pulse generator 503a with the recited functions.

Concerning Figure 2, the patent describes the operation of a current comparator 401b, transistor 502b, and the combination of capacitor 504b and winding 103b, which together correspond to the pulse generator 503a of Figure 1. '031 Patent at fig.1. The patent calls the combination of the capacitor 504b and winding 103b an "output-side triggering blocking oscillator 503b." *Id.* at 5:23–27. Based on this disclosure, the Court holds Figure 2 discloses corresponding structure of

the comparator 401b and blocking oscillator 503b.

Figure 3 shows "[a] fast oscillator" that "drives an AND gate 506c which is also driven by comparison circuit 401c. If the voltage between terminals 13c and 14c is smaller than that of reference 400c, gate 506c passes oscillator 505c pulses to trigger pulse generator 503c." '031 Patent at 6:13–19. That drives transistor switch 502c to source energy from capacitor 501c to the transformer 100c. These pulses "appear as voltage pulses across the primary winding of transformer 100c," which are detected and processed to logic levels by a demand pulse detector 215c . . . to begin an energy-bearing cycle." *Id.* at 6:26–31. Figure 3 thus discloses corresponding structure of the comparator 401c, oscillator 505c, AND gate 506c, pulse generator 503c, and switch 502c.

Finally, Figure 4 shows applying

> the voltage at the junction [of a voltage divider] to an input of a comparator 401d. Should the voltage at that junction exceed the voltage of a reference 400d, also applied to a comparator 401d input, an output of comparator 401d will drop to a logic low, drawing current through a diode 410d, thus presenting a logic low at node De and, after clocking, responsively at node Qc, inhibiting pulses through gate 509d . . . .

'031 Patent at 8:26–35. When pulses are *not* inhibited—that is, when a "logic high" is presented at node De—"an oscillator 505d drives a capacitor 507d and a resistor 508d to supply differentiated pulses . . . to a NAND gate 509d, which in turn drives a primary winding 111d of demand pulse transformer 110d, thus producing demand pulses across a secondary winding 112d thereof." *Id.* at 7:62–67. Based on this, the Court holds the corresponding structure is the comparator 401d, oscillator 505d, flip-flop 412d, and NAND gate 509d.

At the hearing, Samsung argued that, even if "demand pulse generator" is a § 112 ¶ 6 term, there is no language clearly linking or associating structure with the recited functions of the various claims. But "[a]ll one needs to do in order to obtain the benefit of [§ 112 ¶ 6] is to recite some

structure corresponding to the means in the specification, as the statute states, so that one can readily ascertain what the claim means and comply with the particularity requirement of [§ 112 ¶ 2]." *Atmel Corp. v. Information Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999). That is, "for a means-plus-function claim to be valid under § 112, the corresponding structure of the limitation 'must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation.'" *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007) (noting "interpretation of what is disclosed in the specification must be made in light of the knowledge of one skilled in the art"). To be sure, the specification creates some confusion by referring to items 503a and 503c as "demand pulse generators," but the Court ultimately concludes a skilled artisan—someone with two years of practical experience working with switching regulators—would know and understand what structure corresponds to the recited functions.

As a final matter, CogniPower suggests there should be a fifth embodiment that is simply the aforementioned "demand pulse generator 503a" (or "demand pulse generator 503c"). But the only evidence to support that contention is the name given to items 503a and 503c by the specification, which isn't enough. Those elements, notwithstanding their name, cannot generate "demand pulses" by themselves. For one, there must be some way to determine the "demand" for more energy by the load, like a comparator, as required by the recited functions. And most of the claims for which this term is at issue require the "demand pulse generator" to be powered by energy stored in "a capacitor galvanically connected to the transformer. '031 Patent at 12:32–34; *see also* '425 Patent at 14:42–33; '713 Patent at 14:41–43 (requiring, in Claim 18, the "demand pulses" to be "generated using energy stored in [a] capacitor"); *id.* at 17:53–55 (same for Claim 48). CogniPower's position simply doesn't align with the recited functions for the various limitations

in which this term appears.

To recap, the Court holds this is a means-plus-function term. The recited functions use different wording but are not meaningfully different, and a skilled artisan would read the patent as clearly associating any of the following groups of elements with each recited function:

- comparator 401a, switch 502a, and pulse generator 503a;
- comparator 401b and blocking oscillator 503b;
- comparator 401c, oscillator 505c, AND gate 506c, pulse generator 503c, and switch 502c; or
- comparator 401d, oscillator 505d, flip-flop 412d, and NAND gate 509d.

Further, under 35 U.S.C. § 112 ¶ 6, CogniPower is entitled to equivalents of each of these four groupings of elements.

### D. "generating demand pulses" ('031 Patent, Claim 18)

| CogniPower's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning, except as to included terms or phrases otherwise construed. | Necessarily includes a "demand pulse generator"—indefinite, at least for the reasons as "demand pulse generator" |

This dispute closely relates to the dispute about "demand pulse generator." Claim 18 recites the step of "generating demand pulses" in response to "comparing a feedback signal based on a voltage or current at the output port with a reference signal." '031 Patent 14:20–21. Citing *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132 (Fed. Cir. 2003), Samsung argues that, "by requiring the step of 'generating demand pulses,' a POSA would clearly understand claim 18 to necessarily require use of a 'demand pulse generator.'" Dkt. No. 141 at 20. And because "demand pulse generator" is indefinite, so too is this term. *Id.* Thus, Samsung presents two issues: (1) whether the step requires using a "demand pulse generator," and (2) if it does, whether the term is indefinite.

The Court agrees with CogniPower. Foremost, *Biogen* does not stand for the proposition that the steps of a method must be construed as performed or executed only by structure disclosed in the specification. In *Biogen*, the appellate court concluded the patent at issue described the preferred embodiment as the invention itself. *Biogen*, 318 F.3d at 1139 (quoting *Modine Mfg. Co. v. ITC*, 75 F.3d 1545, 1551 (Fed. Cir. 1996)). Samsung points to no analogous evidence here. Regardless, as discussed *supra*, "demand pulse generator" is not indefinite. The Court holds "generating demand pulses" does not necessarily require a "demand pulse generator," and the term is not indefinite. Rather, it should and will be given a "plain and ordinary meaning" construction.

### E. "second circuitry" ('157 Patent, Claims 18, 22, 24); "secondary-side circuitry" ('714 Patent, Claim 18); "second pulse source circuitry" ('031 Patent, Claims 10, 51; '425 Patent, Claims 27, 28)

| CogniPower's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning | At least includes a "demand pulse generator"—indefinite, at least for the same reasons as "demand pulse generator" |

As with the previous term, this dispute relates to "demand pulse generator." According to Samsung, CogniPower's expert conceded each of these terms "necessarily includes a demand pulse generator," and because *that* term is indefinite, so are these. Dkt. No. 141 at 19. CogniPower replies that Samsung proffers no *intrinsic* evidence that these terms must include a demand pulse generator. Dkt. No. 144 at 6. Because Samsung's argument requires a holding that "demand pulse generator" is indefinite, which is a position the Court has already rejected, this term will be given a "plain and ordinary meaning" construction.

### F. "transformer," "power transformer," "pulse transformer" ('031 Patent, Claims 1, 10; '713 Patent, Claims 18, 19, 48; '714 Patent, Claims 18, 19; '157 Patent, Claims 18, 20–22, 35; '425 Patent, Claims 18, 27)

| CogniPower's Construction | Samsung's Construction |
|---|---|

| | |
|---|---|
| Plain and ordinary meaning | "a structure having windings wrapped around an iron or magnetic core configured to transfer electrical energy" |

Samsung contends this term is limited to transformers that have an iron or magnetic core, and excludes transformers that have an "air core." It notes each of the specifications' four embodiments uses the symbol a skilled artisan would recognize as representing a transformer with an iron or magnetic core. Dkt. No. 141 at 24–25. Samsung also argues a skilled artisan would have understood an iron or magnetic core is typical for a transformer in a switched-mode power converter. *Id.* at 25 (citing Oxford Dictionary of Elecs. & Elec. Eng'g, Dkt. No. 141-36 at 623 ("The usual construction is of two coils (or windings) with a magnetic core suitably arranged between them."); Demystifying Switching Power Supplies, Dkt. No. 141-37 at 264 ("Ferrite cores are the only practical choice for switching supply transformer cores.")).

But CogniPower says "transformer" has a plain and ordinary meaning to skilled artisans, and nothing in the intrinsic record disclaims transformers with "air cores." CogniPower characterizes Samsung's argument as "premised entirely on a symbol appearing in the figures." Dkt. No. 144 at 7.

The Court agrees with CogniPower. Samsung presents no evidence that the ordinary meanings of "transformer," "power transformer," or "pulse transformer" excludes transformers with an air core. At best, Samsung shows a transformer with an iron or magnetic core was the *typical* or *practical*, but not necessarily *only*, choice for a transformer in a switched-mode power converter. *See* Dkt. No. 141 at 25. But that it would be "typical" or "practical" is not a basis for narrowing the term's ordinary meaning. The rest of Samsung's argument amounts to importing limitations from the specification based on specific embodiments. Accordingly, the Court construes "transformer" as "a structure having windings with an iron, magnetic, or air core, configured to transfer

electrical energy."

### G. The Transformer-Related Terms:

**"an [input/output]-side coupled inductor connected in circuit" ('031 Patent, Claims 36, 48, 51)**

**"[primary/secondary]-side magnetically coupled conductor[s] [configured to be magnetically coupled to the primary-side magnetically coupled conductor]" ('713 Patent, Claims 18, 26, 48; '714 Patent, Claim 40; '157 Patent, Claims 20, 21, 35)**

| CogniPower's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning | "an [input/output]-side winding of a structure having windings wrapped around an iron or magnetic core configured to transfer electrical energy that is connected in circuit"<br>"the [primary/secondary]-side winding[s] of a structure having windings wrapped around an iron or magnetic core configured to transfer electrical energy [which can be magnetically coupled to the primary-side winding of the structure]" |

According to Samsung, the only "coupled inductors" disclosed in the patents are "transformers." Dkt. No. 141 at 26. Thus, says Samsung, a skilled artisan would understand these terms to have the same meaning as "transformer," and the terms should be construed accordingly. *Id.* CogniPower disputes these terms are used interchangeably with "transformer." Rather, transformers may include inductors or conductors, but "transformers," "inductors," and "conductors" have different meanings to skilled artisans. Dkt. No. 144 at 8.

The Court agrees with CogniPower. While coupled inductors and coupled conductors may be components of transformers, they are distinct elements. Samsung presents no persuasive evidence that supports deviating from the usual meaning of "inductor" or "conductor." Given that, the Court will give these terms a "plain and ordinary meaning" construction.

### H. "flyback converter" ('713 Patent, Claim 18, 48;'714 Patent, Claim 18; '157 Patent, Claims 18, 19, 22, 35)

| CogniPower's Construction | Samsung's Construction |
|---|---|
| Preamble is not limiting | Preamble is limiting |

Samsung says "'flyback converter' is clearly a limitation of the claims." Dkt. No. 141 at 28. In its briefing, however, Samsung fails to support that conclusion and explain why it is "clear." It cites *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1369 (Fed. Cir. 2020), for the proposition "[a] preamble limits the claimed invention if it recites essential structure . . . or if it is 'necessary to give life, meaning, and vitality' to the claim," but fails to explain how the recitation of "flyback converter" in the preambles do either of those. *Id.*

The Court nonetheless agrees this preamble is limiting, because the body of each claim refers back to the preamble. *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."). For example, the body of Claim 18 of the '157 Patent is replete with references to the flyback converter:

> 8. Circuitry for controlling a **flyback converter**, the **flyback converter** comprising:
>
> an input port;
>
> an output port galvanically isolated from the input port such that:
>
> the input port is on a **converter** primary side of **the flyback converter**; and
>
> the output port is on a **converter** secondary side of **the flyback converter**; and
>
> a power transformer configured to transfer input power received at the input port to provide output power at the output port,

> wherein:
>
> the **converter** primary side further comprises a primary-side switch configured to selectively transfer the input power at the input port via the power transformer to the output power at the output port;
>
> the circuitry comprises first circuitry and second circuitry, wherein, when the circuitry is connected to control **the flyback converter**, (i) the first circuitry is on the **converter** primary side and (ii) the second circuitry is on the **converter** secondary side;
>
> . . .
>
> the **converter** secondary side is configured to transmit the demand pulses to the **converter** primary side;
>
> the first circuitry is configured to turn on the primary-side switch in response to the demand pulses conveyed from the **converter** secondary side to the **converter** primary side, wherein the first circuitry, and not the second circuitry, originates the determination of when to turn off the primary-side switch;
>
> frequency with which the primary-side switch is turned on is the frequency of the demand pulses conveyed from the **converter** secondary side to the **converter** primary side to regulate the output port voltage or current . . . .

’157 Patent at 14:5–52.

As far as the effect of holding these preambles limiting, CogniPower characterizes a “flyback converter” as

> a type of isolated converter. In principle, it operates by storing current or energy in a transformer when switched on. The energy gets stored because the forward pulse is typically blocked to prevent discharging. When the switch is turned off, the transformer discharges to the output.

Dkt. No. 136 at 18. At the hearing, Samsung indicated its agreement with this characterization. Because there is no apparent dispute over what a flyback converter is, the Court will give this term

a "plain and ordinary meaning" construction, which it considers to be the characterization provided by CogniPower.

**I. The Origin-of-Determination-for-the-Turn-Off Terms:**

**"wherein the determination of when to turn off the primary-side switch is originated on the primary side and not on the secondary side" ('713 Patent, Claims 18, 48)**

**"wherein the primary-side circuitry, and not the secondary-side circuitry, originates the determination of when to turn off the primary-side switch" ('714 Patent, Claim 18)**

**"wherein the first circuitry, and not the second circuitry, originates the determination of when to turn off the primary-side switch" ('157 Patent, Claim 18)**

**"wherein, when the output port is in regulation, the first circuitry, and not the second circuitry, originates the determination of when to turn off the primary-side switch" ('157 Patent, Claim 22)**

**"wherein, when the output port is in regulation, the determination of when to turn off the primary-side switch is originated on the primary side and not on the secondary side" ('157 Patent, Claim 35)**

| CogniPower's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite |

This dispute concerns an alleged conflict between what Samsung calls "the 'not' limitations" and "the 'never' limitations" for turning off the primary-side switch. Specifically, some claims require the determination of when to turn off the switch to "not" be originated on the secondary side of the converter, whereas other claims also require the determination to "never" be on the secondary side. For example, Claim 18 of the '713 Patent requires a power transformer "wherein the determination of when to turn off the primary-side switch is originated on the primary side and **not** on the secondary side." '713 Patent at 14:27–31 (emphasis added). Claim 34 then further limits Claim 18 such that "the determination of when to turn off the primary-side switch is always originated on the primary side and **never** on the secondary side." *Id.* at 15:65–67 (emphasis

added).

Samsung's position turns on the principle that "[d]ifferent claim terms are presumed to have different meanings." *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008). According to Samsung, "the 'never' limitations in the claims suggest that 'not' means something other than the plain and ordinary meaning suggests," and "must mean something more like 'sometimes.'" Dkt. No. 141 at 28–29. But, continues Samsung, if "not" means "sometimes," the "not" limitations are nonsensical and therefore indefinite. *Id.* at 29.

As Samsung recognizes, the meanings of "not" and "never" are straightforward. Dkt. No. 141 at 28. To the extent there might be overlap or identical scope, that alone does not render these claims indefinite. Moreover, there is no absolute rule that different terms must have different scope. *See Apple Inc. v. Omni MedSci, Inc.*, No. 2023-1034, 2024 WL 3084509, at *3 (Fed. Cir. 2024) ("A party, however, can rebut that presumption in the context of a particular patent."). Although Samsung concludes "there is no logical way to reconcile these 'not' and 'never' limitations," that presupposes these terms need reconciling. Both parties agree these terms have an ordinary meaning, and neither party explains why the Court should deviate from those meanings. Accordingly, the Court will give these various phrases their "plain and ordinary meanings."

### J. "arranged in circuit" ('031 Patent, Claims 1, 10; '425 Patent, Claims 18, 27); "connected in circuit" ('031 Patent, Claims 18, 36, 48, 51)

| CogniPower's Construction | Samsung's Construction |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

The patents use these phrases to describe the relationship of the recited transformer with an input port, a switch, a rectifier, and an output port. For example, Claim 1 of the '031 Patent recites "a transformer comprising (i) a primary winding *arranged in circuit* with the input port and

the switch and (ii) a secondary winding *arranged in circuit* with a first rectifier and the output port . . . ." '031 Patent at 12:14–17 (emphasis added). Similarly, Claim 18 requires "using a rectifier to charge a capacitor during forward pulses of the power converter, wherein the rectifier and the capacitor are *connected in circuit* with the output-port side of the galvanic isolation circuitry . . . ." *Id.* at 14:32–35 (emphasis added). Whereas CogniPower calls these phrases plain and ordinary terms of art, Dkt. No. 136 at 22, Samsung questions what these phrases mean and criticizes CogniPower's "suggestion that all of these different phrases mean the same thing" as inconsistent with the presumption that each claim term should have a different meaning. Dkt. No. 141 at 30.

The Court agrees with CogniPower. To start, despite having the burden of showing indefiniteness, Samsung presents no evidence of how a skilled artisan would understand (or not understand) these terms. While such evidence is not always necessary to show the indefiniteness of a term, these are well-known words in the electrical arts, so the perspective of a skilled artisan seems important. Moreover, Samsung again incorrectly treats the presumption that different terms have different scope as irrebuttable.

On this record, the Court concludes a skilled artisan would readily understand the meaning of the phrases from the context of the surrounding language. Both "arranged in circuit" and "connected in circuit" simply mean "in a circuit"—that is, in the same closed loop of electrical elements. Here, these terms describe the integration of the transformers and other components into the primary and secondary sides of the converter. Using Figure 1 as an example, the power converter (10a) comprises two distinct circuits, each of which is a closed loop for current. One circuit includes the input terminals (11a, 12a), switch (200a), and the primary winding (101a), and the other circuit includes the secondary winding (104), output terminals (13a, 14a), and rectifier (diode

500a). Although Samsung nitpicks the difference between "arranged" and "connected," these terms are not indefinite, are synonyms in this context, and should be given their plain and ordinary meanings.

### K. The "Leading Edge" Terms:

**"a leading edge of a single demand pulse will turn on an input-side commutating switch independent of other demand pulses" ('031 Patent, Claim 32)**

**"a leading edge of a single demand pulse will turn on the switch independent of other demand pulses" ('031 Patent, Claims 47, 62)**

**"primary-side switch turning on is in response to detecting the leading edge of the particular demand pulse independent of any other demand pulses conveyed from the secondary side to the primary side and independent of any other pulse edges appearing on the primary side" ('713 Patent, Claim 25)**

**"primary-side switch turning on is in response to detecting the leading edge of the particular demand pulse independent of any other demand pulses conveyed from the converter secondary side to the converter primary side and independent of any other pulse edges appearing on the converter primary side" ('714 Patent, Claim 28)**

**"switch turning on is in response to detecting the leading edge of the particular demand pulse independent of any other demand pulses conveyed from the output side to the input side and independent of any other pulse edges appearing on the input side" ('425 Patent, Claim 28)**

| CogniPower's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite |

Some claims recite "a leading edge of a single demand pulse will turn on the [primary-side] switch independent of other demand pulses." '031 Patent at 15:37–39 (Claim 32), 17:15–16 (Claims 47), 18:51–52 (Claim 62). Other claims require turning on the primary-side switch "in response to detecting the leading edge of the particular demand pulse independent of any other demand pulses." '713 Patent at 15:10–15 (Claim 25); *see also* '714 Patent at 16:62–67 (Claim 28); '425 Patent at 16:19–24 (Claim 28.

Citing the Abstract, Background, and Specification, Samsung says that, "in the context of the Asserted Patents, turning on the switch depends at least in part upon 'other demand pulses.'" Dkt. No. 141 at 30. "Therefore," concludes Samsung, "individual demand pulses do not turn on the switch entirely independent of other demand pulses." *Id.* This, says Samsung, "renders uncertain the meaning of 'independent' in this context." *Id.*

The Court disagrees. Samsung's position suggests the underlying dispute is whether these claims refer to a specific instance of the primary-side switch turning on, or the collection of switch activations over some period of the converter's operation. Samsung's complaint would be understandable for the latter interpretation, but the plain language of the claim best aligns with the former. In other words, nothing in the intrinsic record suggests this claim language refers to how the primary-side switch reacts over time to multiple demand pulses. Rather, this claim relates to how it reacts to each demand pulse individually, and in that context the meaning of the claim is clear. Accordingly, the Court will give this term a "plain and ordinary meaning" construction.

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "demand pulse[s]"<br>('031 Patent, Cl. 1, 6, 10, 18, 32, 47, 48, 51, 62; '713 Patent, Cl. 18, 25, 26, 30, 36, 41, 48; '714 Patent, Cl. 18, 28, 40; '157 Patent, Cl. 18, 20, 22, 24, 35, 40; '425 Patent, Cl. 18, 28) | "pulse[s] generated on the secondary side that determine when to turn on a primary switch and does not determine when to turn off the switch." |

<table>
<tr>
<td>"demand pulse generator"<br>('031 Patent, Cl. 1, 6, 36, 44, 47, 48; '713 Patent, Cl. 18, 19, 25, 26, 30, 36, 41, 48, 49; '157 Patent, Cl. 35, 40; '425 Patent, Cl. 18)</td>
<td>Governed by 35 U.S.C. § 112 ¶ 6<br>Function:<br>'031 Patent, Claim 1; '425 Patent Claim 18 (and dependent claims)<br>"generating demand pulses applied via the galvanic isolation circuitry to the switch to adjust a frequency of the commutation of the input power to supply a desired amount of voltage or current to the load"<br><br>'713 Patent, Claims 18, 48 (and dependent claims)<br>"(i) determining when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generating corresponding demand pulses"<br><br>'157 Patent, Claim 35 (and dependent claims)<br>"(i) determining when to turn on the primary-side switch based on output voltage or output current at the output port and (ii) generating corresponding demand pulses . . . when a feedback signal based on the output port by voltage is smaller in magnitude than a reference signal"<br>Structure:<ul><li>comparator 401a, switch 502a, and pulse generator 503a;</li><li>comparator 401b and blocking oscillator 503b;</li><li>comparator 401c, oscillator 505c, AND gate 506c, pulse generator 503c, and switch 502c; or</li><li>comparator 401d, oscillator 505d, flip-flop 412d, and NAND gate 509d,</li></ul>and equivalents thereof</td>
</tr>
<tr>
<td>"generating demand pulses"<br>('031 Patent, Cl. 18)</td>
<td>Plain and ordinary meaning</td>
</tr>
</table>

| | |
|---|---|
| "second circuitry"<br>('157 Patent, Cl. 18, 22, 24)<br>"secondary-side circuitry"<br>('714 Patent, Cl. 18)<br>"second pulse source circuitry"<br>('031 Patent, Cl. 10, 51; '425 Patent, Cl. 27, 28) | Plain and ordinary meaning |
| "transformer," "power transformer," "pulse transformer"<br>('031 Patent, Cl 1, 10; '713 Patent, Claims 18, 19, 48; '714 Patent, Cl. 18, 19; '157 Patent, Cl. 18, 20–22, 35; '425 Patent, Cl. 18, 27) | "a structure having windings with an iron, magnetic, or air core, configured to transfer electrical energy" |
| The Transformer-Related Terms | Plain and ordinary meaning |
| "flyback converter"<br>('713 Patent, Cl. 18, 48;'714 Patent, Cl. 18; '157 Patent, Cl. 18, 19, 22, 35) | The preamble is limiting. |
| The Origin-of-Determination-for-the-Turn-Off Terms | Plain and ordinary meaning |
| "arranged in circuit"<br>('031 Patent, Cl. 1, 10; '425 Patent, Cl. 18, 27)<br>"connected in circuit"<br>('031 Patent, Cl. 18, 36, 48, 51) | Plain and ordinary meaning |
| The Leading-Edge Terms | Plain and ordinary meaning |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings

is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 9th day of September, 2024.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE